UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:05-CV-738-H

SNIDER BOLT & SCREW, INC.                                          PLAINTIFF

V.

QUALITY SCREW & NUT                                               DEFENDANT

### MEMORANDUM OPINION AND ORDER

This case centers on a non-compete agreement between Plaintiff, Snider Bolt & Screw,

Inc. ("Snider"), and its former employee, James Scott.[1]  Snider asserts that Scott violated that

agreement when he went to work for Defendant, Quality Screw & Nut ("Quality"), and that

Quality willfully aided Scott in his violation.  On November 18, 2005 this Court entered a

Temporary Restraining Order ("TRO") against Quality prohibiting it from disposing of any hard

drive data it received from Scott, retaining any documents provided by Scott, employing Scott in

a manner that allowed him to use confidential information from Snider for any purpose, and

permitting, encouraging or assisting Scott in violating the non-compete agreement.  The TRO

was issued without a hearing based on the verified complaint of Snider and was in effect for

ninety days.

In the pending motion, Snider asks the Court to hold Quality in contempt for violating the

---

[1] Throughout Plaintiff's brief, it references Scott as a "defendant."  To be clear, Scott is not now, nor has he ever been, a defendant in this case.  The Court has no jurisdiction over claims between Snider and Scott.  The only parties to this case are Snider and Quality.  This distinction is critical to the Court's analysis and the outcome of this Memorandum Opinion.

TRO.[2]  The parties requested that this issue be handled by briefing as opposed to a full hearing.

With the deadlines for such briefing having passed, the issue is ripe for the Court's review.

## I.

Scott began his employment with Snider in 1999.  For the first year, he worked in several

different positions until he became the "key account manager" for Snider's client MTD

Consumer Products ("MTD").  In 2002, Scott signed a non-compete agreement in return for his

continued employment with Snider.  The non-compete states:

> For a period of one (1) year after expiration of this Agreement or after a termination
> becomes effective, Employee will neither directly nor indirectly solicit or sell any
> products which are the same as or similar to the Company's products to those
> persons, companies, firms or corporations who are or were customers of the
> Company while Employee was in the employ of the Company.  Employee further
> agrees not to solicit or induce or attempt to solicit or induce employees of the
> Company to terminate their employment with the Company.

Scott remained employed with Snider until October of 2005.

As of early 2005, MTD was a client of both Snider and Quality; it purchased different

parts from each company.  That year, MTD announced that it wanted to purchase all of its

products from one company and allowed suppliers to bid for the account.  It is undisputed that

Scott worked for Snider during the entire bidding process.  Snider makes no allegation that Scott

did anything improper as related to the MTD bid.  In the end, MTD gave its account to Quality.

After giving its business to Quality, MTD requested that Quality build a warehouse

facility in Jackson, TN to service its needs.  On October 12, 2005, an MTD representative sent

Quality an email in response to Quality's comment that it would need to hire a few new

---

[2] This case was set for a bench trial on February 16, 2010.  The Court held a pretrial conference on
February 10, 2010.  At that conference, the parties agreed that the only issue to be litigated was the alleged contempt
of Quality.

employees to help with the MTD account and the new warehouse. MTD informed Quality that it

had worked with Scott at Snider and that it enjoyed its business relationship with him. In

response, Quality contacted Scott about possible employment and interviews were conducted.

The exact date of Quality's job offer to Scott is unclear, but it appears that he had decided to

leave Snider by the end of the day on October 21, 2005. Scott did not begin working for Quality

until December 5, 2005.

**II**.

Snider filed this action against Quality on November 7, 2005. Within two weeks, the

Court entered a ninety-day TRO which tracked the language of the covenant not to compete.

During the remaining almost five and half years of litigation Snider did not request an extension

or expansion of the original injunctive relief. Indeed, scheduled trials were postponed no less

than on seven occasions.

In March, 2009, each side did move for summary judgment. In short order the Court held

that the covenant not to compete was valid under Kentucky law. The Court also found that

Quality had exposed itself to liability by placing Scott in a position where he might directly

assist in the selling or solicitation of prohibited products. For these reasons, the Court denied

Quality's motion for summary judgment.

Several weeks later, the Court also denied Snider's motion for summary judgment on the

grounds that it would be a close call whether Quality could obtain reasonable use of Scott's

talents and experience without also violating his covenant not to compete. Because Snider could

show no damages, however, the Court did dismiss the unfair competition and contractual

interference claims.

At that time, the Court set a trial date for the only remaining issue, whether Quality had violated the Court's restraining order. Ultimately, the parties agreed that the Court would decide this issue upon the papers and evidence submitted, rather than by live testimony.

**III.**

Before examining the primary area of contention between the parties, the Court will address a few more peripheral issues raised in the briefs. First, Snider argues that the TRO was improvidently granted on the basis of speculation and false evidence. For numerous good reasons, the Court disagrees. Continued employment was sufficient consideration for the agreement, *see Higdon Food Serv., Inc. v. Walker*, 641 S.W.2d 750 (Ky. 1982); as explained below, the agreement was reasonable given its limited scope of application to "sales and solicitation" of current or former customers of Snider; and any ambiguities in the agreement will be construed against Snider as the drafter of the agreement. Moreover, Snider neither filed an objection to the TRO nor requested a hearing during the ninety days of its application. Because the TRO stood at that time, the question is whether it was violated, not whether it was proper in the first place. *See North Am. Coal Corp. v. Local Union 2262*, 497 F.2d 459, 465 (6th Cir. 1974) ("Of course, even if the District Court's injunction was invalid . . . it is settled law that it still must be obeyed until and unless it is overturned on appeal.").

Second, the TRO, by its own terms, only remained in effect for ninety days or until further action of the Court. The Court has taken no such further action. No hearing has been held and no Order given that would extend the TRO. Thus, for Quality to be found in contempt, the actions alleged to have violated the TRO must have occurred during the ninety day period for which the TRO was in effect.

Finally, Snider asserts that Quality assisted Scott in violating his non-compete agreement by authorizing him to solicit Snider employees to work for Quality. This allegation is based on the testimony of Denise Lewis, who states that she was contacted by Scott on October 23, 2005, and asked to leave Snider to join him at Quality. According to Lewis, Scott told her he was "authorized" to pay her significantly more than she was earning at her current job. Snider provides no further evidence to show that Quality knew about Scott's solicitation of Lewis, much less authorized it. Moreover, even if all of Snider's allegations are believed, the solicitation occurred on October 23, 2005, nearly a month before the TRO was entered. Therefore, any solicitation of Lewis cannot be the basis for holding Quality in contempt.

**IV.**

The primary issue here is whether Quality, during the ninety-day period of the TRO, employed Scott in a position that allowed him to violate his non-compete agreement. Snider alleges two violations: (1) Quality allowed Scott to use confidential information in the course of his employment; and (2) Quality employed Scott in a position in which he sold to or solicited business from Snider's former customer, MTD. For the Court to find Quality in contempt, it must be convinced that Snider has proven its allegations by clear and convincing evidence. *See Elec. Workers Pension Trust Fund of Local Union # 58, IBEW v. Gary's Elec. Serv. Co.*, 340 F.3d 373, 379 (6th Cir. 2003).

At the outset, it seemed likely that Quality and Scott may have violated the terms of the covenant not to compete. As the Court noted in a prior opinion, Quality was "walking a very fine line." Nevertheless, as the following analysis shows, the developing evidence simply falls short of proving Snider's case.

A.

To support its first contention, that Quality allowed Scott to use confidential information in the course of his employment, Snider presents only evidence that Scott accessed information on Snider's computer database before quitting his job and that he deleted information from his laptop prior to quitting. Much of the alleged activity took place before Scott was ever contacted by Quality. The Court finds that Snider has presented no evidence that any of that information has ever been relayed to Quality or that Scott has used that information in his work for Quality. In fact, Snider asserts that much of the information he accessed is entirely unrelated to the MTD account and acknowledges that Scott works exclusively on the MTD account for Quality. Thus, Snider seems to acknowledge that much of the information he accessed is irrelevant to his work with Quality. While accessing information on Snider's database and deleting files from his laptop may give rise to suspicions that Scott engaged in wrongful conduct, it is certainly not clear and convincing evidence that Quality violated the TRO. Discovery in this case has been ongoing for almost five years and Snider has failed to find any evidence that Scott used its confidential information in any manner. Thus, the Court cannot find Quality in contempt for violating the TRO based on Scott's alleged viewing of confidential information.

B.

For its contention that Quality employs Scott in a position in which he sells to or solicits from MTD, Snider again largely relies on its own speculation and suspicions. Snider asserts that Scott performs the same function for Quality with respect to the MTD account and, therefore, he must be involved in soliciting business from MTD or making sales to MTD. Nothing in the record, however, proves this contention by clear and convincing evidence.

The Court agrees that if Scott sold products to or solicited business from MTD during the effective period of the TRO, Quality may be held in contempt for assisting him in violating the non-compete agreement. Quality asserts, however, that Scott did not engage in either of those activities. Rather, Quality claims that Scott merely ran the warehouse from which MTD's orders were shipped. Quality points to Scott's deposition, the deposition of other Quality employees and even statements by MTD executives that Scott does not solicit business from or sell products to MTD.[3] Snider offers scant evidence to rebut these statements. It points to several emails in which Scott orders that certain products be shipped to MTD and to a corporate structure form from Quality noting that Scott is responsible for addressing back orders, submitting deviation requests, pulling inventory and validating purchasing. All of these documents are consistent with Scott's claim that he only manages the warehouse for Quality.

C.

The question, then, is whether managing the warehouse constitutes "selling" or "soliciting" as those terms are used in the non-compete agreement. The agreement itself does not define the terms. Therefore, the Court will construe those terms narrowly against the drafter of the agreement, Snider. *See B. Perini & Sons v. Southern Ry. Co.*, 239 S.W.2d 964, 965-66 (Ky. 1951). To "solicit" generally means to try to obtain something desired. *Webster's II New Riverside University Dictionary* 1106 (1994). There is no evidence Scott did anything to solicit business from MTD. In fact, it is agreed that MTD gave its account to Quality, with the intention of buying all of its products from Quality, well before Scott began his employment

---

[3] The Court notes that none of the depositions have actually been submitted for review by either party. Thus, the Court has only the allegations of the parties to rely upon. Because Snider bears the burden of proof in this action, the Court will assume the assertions of Quality are true unless rebutted by evidence from Snider.

there. To "sell" generally means to exchange something for money. *Id.* at 1060. Again, the

evidence indicates that Scott merely coordinated the shipment of products and the management

of the warehouse. Nothing indicates that Scott actually took new sales orders from MTD or was

involved in setting the prices for sales to MTD. While Scott's involvement in the MTD account

may again give rise to a suspicion that he was involved in sales to MTD, a finding of contempt

requires more than a suspicion; it requires clear convincing evidence, of which this Court has

seen none.[4]

## V.

The Court understands that at first impression, this result may be surprising. After all,

Scott entered a "non-compete" agreement with Snider and then proceeded to work for one of

Snider's primary competitors servicing Snider's former client. A close look at the agreement

and the actual evidence reveals otherwise.

The agreement did not prohibit Scott from "working" for a competitor; it only prohibited

Scott from "selling" to or "soliciting" from Snider's current or former customers. That is a very

narrow prohibition, and properly so. In Kentucky, a non-compete agreement must be limited in

scope and duration to be enforceable. *Calhoun v. Everman*, 242 S.W.2d 100, 102 (Ky. 1951).

Generally, the agreement must prohibit competition in a reasonable, specific geographical area.

*Id.* The agreement here has no such geographical limitations. Therefore, it could be argued that

the agreement is unenforceable. What saves the agreement is its limited scope that applies only

to sales and solicitations. Because that limited application allows the agreement to be enforced,

---

[4] It should also be noted that Snider does not allege any actual losses as a result of Scott's employment with Quality. Snider recognizes that it lost MTD's business through no fault of Scott. Therefore, even if the Court found a violation of the TRO, it is unlikely the Court would award Snider any damages.

it must be construed narrowly against the drafter.  Doing so here and viewing the actual evidence

(or the failure of it), demonstrates the correctness of this result.

Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Plaintiff's Motion to Hold Defendant in Contempt of

Court is DENIED and this case is DISMISSED WITH PREJUDICE.

This is a final and appealable order.

cc: Counsel of Record